***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms in part, and reverses in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of parties.
3. An employer-employee relationship existed on the Employee's date of injury, December 25, 2002.
4. The parties are correctly captioned above.
5. At the hearing before the Deputy Commissioner, Defendant stipulated that on December 25, 2002, Plaintiff sustained a compensable injury by accident to her right hip resulting in medical treatment for her right hip. Defendant represented that it has paid all medical expenses related to the treatment of Plaintiff's right hip. Defendant denies that Plaintiff's back condition is causally related to her accident at work.
6. The issue is whether Plaintiff suffered a compensable injury to her back as a result of her accident at work on December 25, 2002; and if so, to what benefits is Plaintiff entitled for her back injury.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 67 years of age. Plaintiff's prior work history includes employment at Blue Cross Blue Shield for 17 years. Plaintiff retired from Blue Cross Blue Shield and subsequently returned on a part time *Page 3 
basis. Thereafter, Plaintiff worked for Manpower and was assigned positions in home healthcare and in various medical records departments. Plaintiff currently receives Social Security benefits.
2. Plaintiff began working for Defendant-Employer in June 2001. As a part of her employment as an EKG technician with Defendant-Employer, Plaintiff covered different floors of the hospital, including the emergency room and intensive care units.
3. Plaintiff had no pre-existing conditions or restrictions that interfered with her ability to perform the essential functions of her job, although she did have a history of 3 back surgeries, including a prior fusion surgery at L4-5 and L5-S1. Plaintiff had been released to return to work on April 27, 1999 with restrictions; but based on her testimony, Plaintiff believed she had been released without restrictions.
4. Plaintiff usually worked the 3:00 p.m. to 11:00 p.m. shift and was the only EKG technician on duty on December 25, 2002. At approximately 9:30 p.m. on December 25, 2002, Plaintiff was working in Defendant-Employer's emergency room. The emergency room was very busy when a motor vehicle accident victim was brought into a trauma room. Plaintiff waited outside of the closed curtain area as part of the code team for this particular patient. An EMT technician, who was over six feet tall and weighed more than 200 pounds, came rushing through the curtain pushing a gurney. The gurney hit Plaintiff in the right hip and caused her to lose her balance, twist and fall into a cabinet. Plaintiff immediately felt a pop in her back, a sharp pain down her leg and pain in her hip. Plaintiff continued her shift until 11:00 p.m. Plaintiff did not seek immediate medical treatment, but applied heat and ice to her right hip area, believing she suffered either a bruise or sprain.
5. Margaret "Peggy" Mitchell, manager of Special Medicine and Cardiovascular Services with Defendant-Employer, was Plaintiff's direct supervisor. She testified that on *Page 4 
December 26, 2002 at approximately 2:45 p.m., Plaintiff reported that she had been involved in a workplace accident the day before. Ms. Mitchell asked Plaintiff if she was okay and Plaintiff indicated she was okay and that her injury was a bruise to her right hip and sciatic nerve pain. Ms. Mitchell testified that she instructed Plaintiff to complete an accident report. Plaintiff later completed an incident report wherein she stated that she was hit in the right hip with a stretcher and the pain was in her sciatic nerve, from her hip down her leg.
6. Plaintiff worked her usual schedule on December 26, 27 and 28, 2002, and was scheduled for time off December 29, 2002 through January 6, 2003.
7. On December 26, 2002, Plaintiff saw Dr. Daniel Crocker, a staff physician with Defendant-Employer. Plaintiff complained of pain in her right hip and sciatic nerve pain. Dr. Crocker prescribed a muscle relaxant and pain medication, and recommended heat and ice therapy. Plaintiff followed Dr. Crocker's recommendations until January 8, 2003, when she requested further medical treatment due to increasing pain.
8. On January 8, 2003, Plaintiff reported to Susan Wood, an occupational healthcare nurse for Nash Health Care Systems that her symptoms had gotten worse and that she needed medical treatment. Ms. Wood referred Plaintiff to Nash Urgent Care where an examination and x-rays of Plaintiff's spine were performed. Plaintiff complained to medical providers at Nash Urgent Care of pain in her right hip and "SI joint / glutial region." The x-rays revealed no evidence of an acute back injury, but evidence of a lumbar spine contusion suggestive of radiculopathy. Dr. Mullen at Nash Urgent Care advised Plaintiff to get follow-up care from an orthopedic physician and took her out of work. Plaintiff scheduled an appointment to see Dr. David Miller who had previously treated her, but Ms. Wood instead referred Plaintiff to Dr. *Page 5 
Greig McAvoy, the orthopedic surgeon that Defendant had selected to treat the Workers' Compensation injuries of its employees.
9. Dr. McAvoy examined Plaintiff on January 13, 2003. Dr. McAvoy reviewed Plaintiff's x-rays, conducted an exam, and diagnosed Plaintiff with a right hip sprain or contusion. He recommended symptomatic treatment and told Plaintiff that she could continue with her normal activities and that her injury would heal over time. Dr. McAvoy released Plaintiff to return to work without restrictions with a follow up appointment 6 weeks later. He opined that Plaintiff's injury was mild. Plaintiff did not believe she was capable of returning to work at that time because she testified that she had difficulty walking, bending or sitting and "was in excruciating pain." Plaintiff did not return to work, but she did give her employer the return to work note from Dr. McAvoy and gave notice that she could not return to work and that she had an appointment with Dr. Miller.
10. Plaintiff was seen by Dr. David Miller, an orthopedic surgeon with a specialty in neck and back treatment, on January 28, 2003. Plaintiff had previously treated with Dr. Miller beginning December 29, 1998 for an injury at L4-5 and L5-S1 and he had performed fusion surgery for her problems at the L4-5 and L5-S1 levels on January 27, 1999. Dr. Miller had released Plaintiff on April 27, 1999 with restrictions of no lifting over 20 pounds and no driving over 2 hours at a time. No permanent partial disability rating was asked for or given. Dr. Miller did not treat Plaintiff for back or spine problems again until January 28, 2003. He testified that the EKG technician job was within Plaintiff's restrictions.
11. After examining Plaintiff on January 28, 2003, Dr. Miller felt that Plaintiff had some type of nerve entrapment or pinched nerve going on in the back probably above the fused area. He recommended exercise-based physical therapy as well a myelogram and CAT scan of *Page 6 
Plaintiff's low back that were done on February 7, 2003. The myelogram showed a "solidly healed fusion at the previous surgical site," but there was narrowing of the spinal canal at L3-4 and narrowing of the nerve root outlet hole where the nerve exits the spinal canal at L3-4. Dr. Miller removed Plaintiff from work.
12. Dr. Miller treated Plaintiff with epidural cortisone injections into her low back and with pain medication, which did not provide relief. Plaintiff was given a CT diskogram at L2-3 and L3-4 to primarily determine which disk levels needed surgery. The diskogram revealed a tear in the right lateral aspect of the disk from the central portion of the nucleus to the periphery. Plaintiff also had an EMG nerve conduction study, which indicated L4 radiculopathy on the right side and was compatible with her complaints.
13. Dr. Miller was of the opinion that surgery was needed at the L3-4 level, which was a different level from the L4-5 and L5-S1 levels for which he had performed surgery in 1998. On May 12, 2003, Dr. Miller performed an L3-4 fusion, bilateral laminectomy, foraminiomy and facetectomy on Plaintiff. Dr. Miller's operative notes indicate that he repaired Plaintiff's disk tear and stenosis. He gave Plaintiff an out of work note for 6 months.
14. In his operative notes, Dr. Miller listed as both his pre-operative and post-operative diagnosis the following: (a) L3-4 lumbar spondylosis, (b) L3-4 lumbar spinal stenosis, and (c) L3-4 disk disease. During surgery he found that Plaintiff's stenosis was much greater than he originally appreciated.
15. With respect to causation, Dr. Miller opined that the narrowing (stenosis) of Plaintiff's spinal canal was "probably and most likely a combination of pre-existing degenerative changes, with a superimposed injury." He testified that the condition can be asymptomatic, but if a person has some type of trauma, it can become symptomatic. Dr. Miller further opined that Plaintiff's *Page 7 
disk tear could have been caused by trauma, wear and tear or degenerative processes, but he could not give an opinion on which one caused the tear.
16. As of June 2, 2005, the date of Plaintiff's last visit with Dr. Miller prior to his deposition, Plaintiff still had some residual right leg symptoms that seemed to be successfully treated with a cortisone injection around the L4 nerve root on the right side. Dr. Miller testified that the L4 injection he prescribed was related to Plaintiff's complaints of radiation of pain into the right leg. Dr. Miller also testified that the L3-4 disk was fused and healed, but Plaintiff had a small localized area over the back of her right hip that required an injection for pain and she was scheduled to be seen in three months to determine if she received pain relief.
17. As of the date of Dr. Miller's deposition on July 28, 2005, he was still treating Plaintiff for conditions related to her original complaints of radiation of pain down her right leg. He testified that he would not have any objection to Plaintiff performing work such as receptionist or sales clerk and that she could participate in vocational rehabilitation. He further testified that he would assign restrictions of no lifting of more than 20 pounds, no repetitive bending at the waist, no sudden twists or turns of the waist, avoiding prolonged driving over two hours without taking a break, and no excessive vibrations.
18. Dr. Miller has not assigned a permanent partial impairment rating or found Plaintiff to be at maximum medical improvement. Plaintiff wants Dr. Miller to be authorized as her treating physician.
19. The Full Commission finds that Plaintiff has proven by the greater weight of the evidence that she had pre-existing, non-disabling, degenerative changes in her spine and that the trauma to her spine resulting from her injury by accident superimposed upon this condition caused her spinal stenosis at L3-4 to become symptomatic enough to require surgery at L3-4 and *Page 8 
result in disability. Plaintiff has not proven by the greater weight of the evidence that the disk tear seen on the CT diskogram was causally related to her injury by accident as Dr. Miller was only able to give the opinion that the disk tear could have been caused by the trauma from her injury, wear and tear or degenerative changes.
20. Dr. McAvoy saw Plaintiff one time. Dr. McAvoy testified that a contusion or sprain would represent a soft-tissue injury, which would generally take around 6 weeks to heal, and he did not note any difficulty or problems associated with any injury to, or aggravation of Plaintiff's lumbar spine. Dr. McAvoy opined that Plaintiff sustained only minor trauma to the right hip, and right buttock area outside her hip. He also testified that Plaintiff did not complain about pain in her back area at the time of his examination. Dr. McAvoy saw Plaintiff approximately 2 weeks after her date of injury and he was of the opinion that he would have expected by that time to see symptoms from a back injury develop if they had been related to an accident occurring about two weeks earlier.
21. Dr. McAvoy further testified that Plaintiff presented with x-rays of the lumbral-sacral spine, which were basically negative, but that an x-ray would not show a tear in the right lateral aspect of a disk in the lumbar area. Plaintiff's physical exam, in his opinion, did not show a positive finding and according to Dr. McAvoy, a CT diskogram can often show a false positive finding.
22. Dr. McAvoy found it surprising that nearly four months after the Plaintiff's visit with him, an L3-4 decompression and fusion were performed to repair a tear. He stated that it is possible the pain medication Plaintiff was prescribed could have masked some of her pain; however, it was unlikely that taking the medications would have masked all the findings. *Page 9 
23. Dr. McAvoy opined that the injury Plaintiff sustained on December 25, 2002, did not result in an injury to her spine and there was no need for any medical treatment to her lower back. He further opined that being hit in the hip, making a twisting motion and falling into a cabinet would not be consistent with the onset of a tear in the disk, and the most common etiology of a tear would be degenerative changes in the disk. Dr. McAvoy also opined that trauma can cause a tear, and it is possible, but not likely that the incident Plaintiff described caused her injury.
24. The Full Commission gives greater weight to the testimony of Dr. Miller over that of Dr. McAvoy because Dr. Miller completed more extensive tests and performed Plaintiff's surgery. Dr. McAvoy only examined Plaintiff on one occasion and did not perform any diagnostic tests. The Full Commission finds that Dr. Miller is in a better position to give opinion testimony on causation for Plaintiff's injury.
25. Plaintiff sustained an injury by accident arising out of and in the course of her employment on December 25, 2002 when she was hit by a stretcher or gurney, causing her to twist and fall against a cabinet. Plaintiff's testimony concerning the onset of back pain and sciatic nerve type pain immediately after her injury by accident is found to be credible and supports Dr. Miller's causation opinion. Plaintiff's surgery was reasonably required to provide relief, effect a cure or lessen the period of disability. There is insufficient evidence from which to apportion that part of Plaintiff's surgery that was related to his stenosis from the part related to his disk tear.
26. The Full Commission further finds that Plaintiff has established by the greater weight of the evidence that she is unable to return to her past work with Defendant-Employer. Dr. Miller testified, however, that he would not have any objection to Plaintiff performing work *Page 10 
such as receptionist or sales clerk. He opined at his deposition that Plaintiff would have been able to participate in vocational rehabilitation as of June 2, 2005 and the work restrictions he gave would apply as of the date of his deposition since Plaintiff's nerve root injection seemed to have taken hold. In addition, the Full Commission finds credible Plaintiff's own opinion based on her employment with Defendant-Employer that she was unable to return to work in any employment until immediately prior to the date of hearing before the Deputy Commissioner because of disabling back pain.
27. At the hearing, Plaintiff testified that she looked for work in various places including a receptionist position with the Boice Willis Clinic, employment in a similar position with an Eye Care Center, employment with Dillon Orthopaedic Care Center, employment with Belks performing general sales work, and with a doctor's office next to the Employment Security Commission building. Plaintiff testified that she is now capable of performing light-duty work, but had not been able to secure suitable employment.
28. As of July 28, 2005, Plaintiff had not reached maximum medical improvement. Based on the greater weight of the evidence, Plaintiff was totally disabled from working in any employment from January 8, 2003 through June 2, 2005, except for the brief period from January 13, 2003 through January 28, 2003. Thereafter, Plaintiff was capable of performing only light duty work. Plaintiff only had a limited opportunity to seek suitable employment after she became able to perform light duty work with restrictions a few weeks before her hearing. Her efforts to find suitable employment were unsuccessful and Plaintiff remained totally disabled as of the date of hearing.
29. The Form 18 notice of accident and Form 33 request for hearing filed by Plaintiff indicate that the body part involved in the December 25, 2002 accident is Plaintiff's back. *Page 11 
Plaintiff filed the Form 18 notice of accident on January 17, 2003. Defendant filed a Form 61 denial of claim on June 27, 2003. At the hearing before the Deputy Commissioner, Defendant stipulated that on December 25, 2002, Plaintiff sustained a compensable injury by accident to her right hip resulting in medical treatment for her right hip. Defendant represented that it has paid all medical expenses related to the treatment of Plaintiff's right hip. However, the Full Commission has found that Plaintiff's injury by accident also caused injury to her back and contributed to the need for back surgery and to her disability for which Defendant is also liable.
30. A Form 22 wage chart was submitted in this case. Based on the Form 22 wage chart, Plaintiff's average weekly wage was $321.65, yielding a compensation rate of $214.44.
31. Plaintiff is entitled to have Defendant pay for medical expenses incurred or to be incurred as a result of her compensable back and hip condition and resulting surgery, for so long as such treatment may reasonably be required to provide relief, effect a cure or lessen the period of disability.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On December 25, 2002, Plaintiff suffered an injury by accident to her right hip and back arising out of and in the course of her employment with Defendant-Employer when she was hit in the right hip area with a stretcher or gurney, twisted and fell against a cabinet. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven by the greater weight of the evidence that the trauma she sustained to her spine as a result of the accident caused her pre-existing stenosis to become *Page 12 
symptomatic to the extent that surgery was required on May 12, 2003. Where there exists a causal relationship between the injury and the employment, the injury is compensable as work related. Holley v. ACTS,Inc., 357 N.C. 228, 231, 581 S.E. 2d 750, 752 (2003). "[T]he [employee] must prove that the accident was a causal factor [of the injury] by a `preponderance of the evidence[.]'" Ballenger v. ITT Grinnell Indus.Piping, Inc., 320 N.C. 155, 158-59, 357 S.E. 2d 683, 685 (1987). The competency of expert opinion testimony for determination of causation in complicated medical questions (or those questions above the layman's ordinary experience and knowledge) turns on whether the opinion is based on mere speculation or conjecture. Young v. Hickory Bus. Furn.,353 N.C. 227, 230, 538 S.E. 2d 912, 915 (2000); Holley, 357 N.C. at 233,581 S.E. 2d at 753. In the present case, Plaintiff has established that she injured her hip and back as a result of being hit in the hip with a stretcher or gurney, twisting and falling into a cabinet. Plaintiff's testimony concerning the immediate onset of back symptoms after her accident, which the Full Commission has found credible and Dr. Miller's opinion that Plaintiff's stenosis or narrowing of the spinal cord was "probably and most likely" a combination of pre-existing degenerative changes with a superimposed injury are sufficient to meet Plaintiff's burden of establishing a causal relationship between her injury by accident and resulting surgery and disability. Plaintiff has not met her burden of proving a causal relationship between the trauma suffered due to her December 25, 2002 and her disk tear.
3. The Full Commission is unable to apportion the need for surgery between Plaintiff's stenosis related to her injury and her pre-existing conditions. Plaintiff's injury by accident significantly contributed to Plaintiff's need for surgery and the surgery was reasonably required to provide relief, effect a cure or lessen the period of disability.Konrady v. U.S. Airways, Inc., 165 N.C. App. 620, 629, *Page 13 599 S.E.2d 593, 599 (2004) (citation omitted) ("[A]lthough apportionment may be appropriate when a work-related and a non-compensable condition combine to cause disability, an employee may receive `full compensation for total disability without apportionment when the nature of the employee's total disability makes any attempt at apportionment between work-related and non-work-related causes speculative.'").
4. "The burden is on the employee to show that he is unable to earn the same wages he earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). Here, Plaintiff has established by the greater weight of the evidence that she was totally disabled from working in any employment from January 8, 2003 through June 2, 2005, except for the brief period from January 13, 2003 through January 28, 2003. Thereafter, Plaintiff was capable of performing only light duty work, but only had a limited opportunity to seek suitable employment after she became able to perform light duty work with restrictions a few weeks before her hearing before the Deputy Commissioner. Plaintiff's efforts to find suitable employment were unsuccessful and Plaintiff remained totally disabled as of the date of hearing.
5. Plaintiff's average weekly wage was $321.65, yielding a compensation rate of $214.44. N.C. Gen. Stat. § 97-2(5). *Page 14 
6. Plaintiff is entitled to have Defendant pay for medical expenses incurred or to be incurred as a result of her compensable back condition and resulting surgery, for so long as such treatment may reasonably be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to Plaintiff temporary total compensation at the rate of $214.44 per week for the period of January 8, 2003 through January 13, 2003, and January 28, 2003 through the date of hearing before the Commission, and continuing until further Order of the Commission. This amount has accrued and shall be paid in a lump sum.
2. Defendant shall pay for all medical expenses incurred or to be incurred for treatment of Plaintiff's hip and back conditions and related surgery, when bills for the same have been approved in accordance with the provisions of the Act.
3. In its discretion, the Full Commission herein approves Dr. Miller as Plaintiff's treating physician.
4. Twenty-five percent of the compensation awarded Plaintiff under Paragraph 1 of this Award is hereby approved as attorney's fees. The accrued amount shall be deducted from the amount awarded to Plaintiff and shall be paid directly to Plaintiff's counsel in a lump sum. Thereafter, Plaintiff's counsel shall receive every fourth check.
5. Defendant shall pay all costs.
This the ___ day of April 2007.
S/___________________
 BERNADINE S. BALLANCE
 COMMISSIONER
CONCURRING:
S/___________________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
S/___________________ BUCK LATTIMORE CHAIRMAN